**In re James S. NANCE, Bankrupt.**

**Appeal of COOLIDGE BANK AND TRUST COMPANY.**

**No. 76–1541.**

United States Court of Appeals, First Circuit.

Submitted April 7, 1977.

Decided June 13, 1977.

Santo J. Ruma, Boston, Mass., on brief for appellant.

Erwin E. Cooper, Boston, Mass., on brief for appellee.

Before COFFIN, Chief Judge, MARKEY, Chief Judge,* CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Coolidge Bank and Trust Co. (the bank) petitioned the bankruptcy judge to have a debt of the bankrupt, James S. Nance, declared non-dischargeable. After an evidentiary hearing, the bankruptcy judge determined that the bankrupt had willfully and maliciously converted $24,000.09 which was the property of the bank, and that the bankrupt's liability to the bank for this amount was a non-dischargeable debt under section 17(a)(2) of the Bankruptcy Act, 11 U.S.C. § 35(a)(2).[1] Nance appealed this ruling to the district court, which reversed on the ground that the Massachusetts "Assignment of Wages" statute, Mass.Gen.Laws Ann. ch. 154, had invalidated Nance's attempted assignment of deferred salary to the bank. The bank appeals.

### I

Nance was a professional football player for the New England Patriots. He became a customer of the bank in 1968 or 1969 and soon acquired a checking account, a Master Charge account, an Executive Credit Agreement, and a commercial loan. By September 1970, the bank advised Nance

---

* Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. Section 17(a)(2) provides, in pertinent part, "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . are liabilities for . . . willful and malicious injuries to the person or property of another. . . ."

that he was in arrears on many of his obligations and his loans should be brought up-to-date. Nance and his agent, Mr. Myers, met with the bank's officers on September 7, 1970 and gave assurances that the bank would be paid. At the meeting Nance executed a document entitled "Assignment of Contract". The subject of the purported assignment was "Standard Player contract—Boston Patriots Football Club, Inc., and player James S. Nance, Jr., dated 9/7/70" covering the 1970, 1971, and 1972 playing seasons. The assignment recited Nance's "current" and "deferred" compensation for the three seasons.[2] At the bottom, just above Nance's signature, came the statement: "As to this contract and the above mentioned compensation, I do assign that portion of said contract over to the Coolidge Bank and Trust Company as collateral for any monies loaned to me" by the bank. Nance testified that the bank officers told him that the instrument was merely "something to pacify the board of directors" and was not true collateral. He said that he intended at the time to pay off his obligations to the bank from investment income and from his salary from the Patriots. The president of the bank testified to the contrary that both Nance and the bank understood that this assignment of Nance's current and deferred compensation was backup collateral.

Nance was traded to another club sometime after the 1971 season, and while he was there, Myers enjoyed "full power of attorney on all monies due [Nance] by the New England Patriots". An exhibit in the record reveals that in May, 1972, the Patriots' president wrote to Myers indicating his willingness to release Nance from the third year of his contract but showing strong opposition to a request from Myers that the Patriots accelerate payment of Nance's deferred income. In September, 1972, bank auditors were questioning the adequacy of the bank's security for outstanding loans to Nance, and Nance executed a "Declaration of Revocable Trust" naming himself as sole beneficiary and designating the bank and Myers as trustees with "full and absolute power over all monies owed to [Nance] by the New England Patriots" and a right "to a sixty-day notification by the New England Patriots in the event that any monies owed the Settlor by [the Patriots] are to be paid directly to him or on his behalf." A copy of the 1970 Player Contract was attached to the trust instrument. The trust could not be altered, amended, revoked or terminated by Nance for one year after its execution without the agreement of the trustees.

The following month, the bank called Nance in and asked him to consolidate in one instrument all loans previously made to him by the bank. This he did by executing a demand note, dated October 6, 1972, in the amount of $55,809.32.[3] No new consideration was given. The note recited that Nance had deposited as collateral security the following property: "Assignment of Revocable Trust on monies owed to James Nance by the New England Patriots". The bank considered this assignment "backup collateral" on Nance's personal obligation on the note. Nance testified that he never told the bank that it would be paid out of his deferred compensation, but toward the end of his cross-examination, the following exchange took place:

"Q [D]o you deny that you intended to assign to the Coolidge Bank & Trust

---

2. The stated amounts were: Season 1970, Current Compensation—$30,000, Deferred Compensation—$55,000; Season 1971, Current Compensation—$30,000, Deferred Compensation—$70,000; Season 1972, Current Compensation—$30,000, Deferred Compensation—$125,000. Payment of the deferred compensation for 1970 was to begin in 1975 and run through 1980; payment of the deferred compensation for 1971 was to begin in 1981 and run through 1988.

3. The demand note, which appears in the record, initially was in the amount of $55,809.32. In the "Statement of Agreed Fact" the parties state that on October 6, 1972, the date the demand note was executed, Nance owed the bank $55,709.32 on his outstanding loans. There is no clear explanation for the discrepancy. But four days after executing the note, Nance made his first payment of $100, reducing the amount outstanding to $55,709.32, and this may explain the difference in figures.

Company the deferred compensation that you were to receive from the Boston Patriots?

.   .   .   .   .

"A    At some point, yes; if it came down to no other way of paying the Coolidge Bank, yes   .   .   .   ."

By January, 1973, Nance was not current on interest obligations on the demand note. Contemplating legal action, the bank sought advice regarding the "Assignment of Contract" and "Declaration of Revocable Trust" executed by Nance. Counsel advised that both were questionable as legal documents to be enforced by the bank. The bank then called all parties together for a meeting on February 16, 1973. Nance testified that he felt the purpose of the meeting was to produce something "to appease the Board of Directors." The bank's president testified that the meeting was called to determine when the bank was "going to get paid based on the assignment of the collateral" and that Nance and Myers assured the bank "that they would pay out of this particular assignment this collateral and that Mr. Myers was about to enter into negotiations with the Patriots to produce this money". He testified further that the parties agreed to meet with the bank's counsel the following day "where, in the spirit of cooperation, an instrument could be perfected that would make [counsel] happy as far as collecting money from the Patriots". Another bank officer present at the meeting testified that it was his understanding that a meeting would take place the following day "to draft a new form and   .   .   . to contact the Patriots regarding it." A meeting was held the following day between counsel, Nance and Myers. Myers testified that the bank's counsel had suggested that Nance execute a new agreement to collateralize the monies owed to Nance by the Patriots but that Nance declined to sign any new document because he was engaged in delicate negotiations with the Patriots for accelerated payment of the deferred compensation. No new document was executed at this meeting.

On April 2, 1973 Nance wrote the bank indicating that he had requested of the Patriots "a fifteen thousand ($15,000.00) dollar advance against deferred income" and that the Patriots "acknowledg[e] that I have already earned the monies described in a previous assignment to the Coolidge Bank and Trust Co.", and stating his "intention to deliver up to the bank, fifteen thousand ($15,000.00) dollars sometime within the next two weeks; twenty-five thousand ($25,000.00) dollars with the first week of January, 1974 and the balance of all monies due within the first week of January, 1975." Nance did not pay the bank according to the schedule indicated, but the bank took no action. One bank officer testified that the bank did not proceed to collect on the collateral because of assurances by Myers and Nance on several occasions that Nance would make good on his debt.

In early December, 1973, Nance and the Patriots settled Nance's claim to deferred income for $64,056.59, of which $35,056.50 was credited to discharge a promissory note previously executed by Nance in favor of the Patriots. The balance of $29,000.09 was paid to Nance in two installments: $14,-000.00 in December, 1973 and $15,000.09 in January, 1974. Nance turned over to the bank $5,000.00 out of the first installment, but failed to pay anything more on the note. In March, 1974, the bank brought an action in state court on its promissory note for the unpaid balance of $53,025.92. In July, 1974, Nance filed his petition for bankruptcy, which stayed the action in state court.

█    The bank then filed its petition with the bankruptcy judge seeking to establish the debt of the bankrupt to the bank as $24,000.09 and to have it declared a non-dischargeable debt. The bank had the burden of proving that the money Nance received from the Patriots was "property" of the bank and that it was willfully and maliciously converted. See Bennett v. W. T. Grant Co., 481 F.2d 664 (4th Cir. 1973); Haerynck v. Thompson, 228 F.2d 72 (10th Cir. 1955); note 1, supra. The bankruptcy judge found that Nance "knew he was assigning his deferred income as security and

intended to do so" and ruled that the bank held an effective assignment. In his view, Nance's acts and words indicating an intention to make the bank the owner of his claim to deferred income were sufficient to create an equitable assignment as between the parties even if the documents themselves did not create a legally enforceable assignment. *See Kagan v. Wattendorf & Co.*, 294 Mass. 588, 3 N.E.2d 275 (1936); *Cosmopolitan Trust Co. v. Leonard Watch Co.*, 249 Mass. 14, 143 N.E. 827 (1924). As evidence of Nance's intention to create an assignment and his recognition of the bank's interest in the deferred income, the bankruptcy judge pointed to the purported assignment of September 7, 1970, the trust instrument of September, 1972, the note of October 6, 1972 assigning as security the "Revocable Trust on monies owed to James Nance by the New England Patriots", Nance's letter to the bank of April 2, 1973, and "the repeated requests to the bank not to notify the Patriots because of its effect on the settlement negotiations". The bankruptcy judge ruled that the Massachusetts statutory scheme governing "Assignment of Wages", Mass.Gen.Laws Ann. ch. 154, did not affect his conclusion. Indeed, he observed that the statute "may well be inapplicable" since all of the deferred income which was the subject of the assignment had been earned by the end of the 1971 season and was not, thereafter, "future wages" within the meaning of the statute; in any event, he felt, the statute would not defeat an equitable assignment as between the parties. On the question of whether there had been a willful and malicious injury to property of the bank, the bankruptcy judge ruled that Nance's knowledge that he had assigned his deferred compensation and that the bank had relied on his representations in not notifying the Patriots made his retention of the funds a willful and malicious conversion.

On appeal from the bankruptcy judge, the district court recited the latter's finding that Nance "intended to assign to the Bank the deferred compensation payable to the Bankrupt by the [Patriots] to secure his existing indebtedness to the Bank in the amount of $55,709.32, and that the Bank agreed to the assignment" and ruled that this finding was supported by the evidence and "is not susceptible to attack as clearly erroneous." However, the district court reversed the order below on the ground that the assignment was ineffective because not in compliance with Mass.Gen.Laws Ann. ch. 154. Reciting the policy of the statute "to protect the wage earner", the district court rejected the bankruptcy judge's conclusion that the statute would not apply to an equitable assignment as between the parties. The court then looked to the language of the statute and construed the term "future wages" as used in section 3 of chapter 154 to "include all wages to be paid out by an employer in the future, making the provisions of section 3 applicable to the assignment of deferred compensation here irrespective of whether the assignment is said to have ripened after the wages had been earned." Since the assignment was not made in accordance with the requirements of section 3, *see* note 4, *infra*, judgment was entered for Nance.

On appeal to this court, the bank argues that the district court erred in ruling that Nance's assignment of his claim to deferred income was invalid for failing to comply with the conditions set forth in section 3 of chapter 154. Nance, of course, urges support of the ruling. As additional grounds for reversing the bankruptcy judge's finding of non-dischargeability, Nance also argues that the bank never received an assignment from him, and that, even if it had, his actions did not amount to a willful and malicious conversion. We agree with the district court insofar as it ruled that the "Assignment of Contract" executed by Nance in 1970 was an assignment of "future wages" subject to state law and was invalid for failing to comply with the conditions set forth in section 3. However, we read the bankruptcy judge's findings as indicating a fresh assignment in October of 1972, by which time Nance had left the Patriots and had fully earned the deferred compensation in question. We think an assignment covering income fully earned

would not be subject to the requirements of section 3 and effected a valid transfer to the bank. We affirm the bankruptcy judge's ruling that Nance's retention of funds received in settlement of his claim amounted to a willful and malicious conversion of the bank's property.

## II

■ The "Assignment of Contract" executed by Nance on September 7, 1970 was plainly invalid. Made in advance of the 1970 playing season, and covering income to be earned then and in seasons to come, the assignment fell within the class of assignments subject to section 3; it was an "assignment of or order for future wages".[4] The section sets forth numerous conditions for the validity of an assignment none of which were met. To hold, as did the bankruptcy judge, that an assignment which does not conform to these statutory requirements is valid as between the parties because otherwise effective would be to defeat the language and clear intent of the statute, the object of which is to protect wage earners and their families. *See* 4 Corbin on Contracts § 879, at 534 (1951).

But the bankruptcy judge did not base his finding that Nance "knew he was assigning his deferred income as security and intended to do so" solely on the "Assignment of Contract" executed in 1970. He pointed also to the "Declaration of Revocable Trust" executed in September of 1972, to which a copy of the contract had been attached, and the demand note for $55,-809.32 signed by Nance in October, 1972, which mentioned as collateral the Trust and the monies owed him by the Patriots.

■ Nance argues on appeal that, quite apart from any effect of Mass.Gen.Laws Ann. ch. 154, § 3, the bankruptcy judge would have erred in finding, on the basis of these documents, that Nance assigned the deferred income to the bank in 1972. And it is true that, standing alone, the Trust instrument cannot be construed as an assignment, although it was meant to be a security instrument of sorts in favor of the bank and evidenced some recognition by Nance of claims other than his own to the deferred income. But the Trust was soon followed by execution of a demand note consolidating all prior indebtedness into one instrument, and the note expressly listed as collateral security, "Assignment of Revocable Trust on monies owed to James Nance by the New England Patriots". Given the bankruptcy judge's findings as to Nance's intentions, and the context in which these documents were prepared and executed, we think the bankruptcy judge was entitled to regard Nance as having, at this time, meant to provide as collateral for the note, which consolidated all his prior indebtedness, a fresh assignment of his interest in the deferred income.[5] The district court under-

---

**4.** Mass.Gen.Laws Ann. ch. 154, § 3, provides: "No assignment of or order for future wages other than one subject to the preceding section shall be valid for a period exceeding two years from the making thereof, nor unless made to secure a debt contracted prior to or simultaneously with the execution of said assignment or order, nor unless executed in writing in the standard form set forth in section five and signed by the assignor in person and not by attorney, nor unless such assignment or order states the date of its execution, the money or the money value of goods actually furnished by the assignee and the rate of interest, if any, to be paid thereon. Three fourths of the weekly earnings or wages of the assignor shall at all times be exempt from such assignment or order, and no assignment or order shall be valid which does not so state on its face. No such assignment or order shall be valid unless the written acceptance of the employer of the as-

signor, and, if the assignor is a married man, the written consent of his wife to the making thereof, are endorsed thereon or attached thereto."

**5.** By 1972, Nance having left his Massachusetts employer and negotiations between Nance and the Patriots being in progress over the amount the latter owed him, the importance of the deferred income—being one of Nance's principal assets in Massachusetts—would have been far more evident than in 1970. The bank's president testified to a continuing understanding in all dealings that the deferred income was to be the backup, and Nance, in his testimony, came close to admitting to this. The bankruptcy judge explained the bank's failure to contact the Patriots on the ground of Nance's importunities against prejudicing his own negotiations with the Patriots.

stood the bankruptcy judge to have so found: the court characterized the bankruptcy judge as finding that Nance "intended to assign to the Bank the deferred compensation payable to the Bankrupt by the [Patriots] to secure his existing indebtedness to the Bank in the amount of $55,-709.32 [the total amount of Nance's debt to the bank in October, 1972, according to the parties]". We similarly interpret the bankruptcy judge's findings, and agree that, not being clearly erroneous, the finding of an intention to assign at this later time must stand. Under Massachusetts law, a communicated intention to assign provides the basis for finding a valid equitable assignment. "The important thing is the act and the evidence of intent; formalities are not material." *Cosmopolitan Trust Co. v. Leonard Watch Co., supra,* 249 Mass. at 19, 143 N.E. at 829.[6] Considering the actions that were taken together with the evidence of intent we believe the record adequately supports a finding of an equitable assignment when the note was executed in October of 1972.

We come, then, to whether the district court was correct in holding Nance's assignment at this later time invalid for failing to comply with the requirements of section 3

of the Massachusetts "Assignment of Wages" statute. The district court was persuaded by the difference in language used in sections 2 and 3 of chapter 154 to define the class of assignments subject to the requirements of each section. Section 2 begins: "No assignment of or order for wages or salary to be earned in the future to secure a loan of less than three thousand dollars shall be valid . . . ."[7] Section 3 begins: "No assignment of or order for future wages other than one subject to the preceding section shall be valid . . . ."[8] The court thought that the use of different language "was meant to be expressive of the distinction between all wages to be paid out by an employer in the future and those wage payouts reflecting only work done by the assignor after the wage assignment is executed." While this is a possible reading, no reason for the legislature to have made such a marked distinction in the coverage of the two provisions has been called to our attention, and we think it more reasonable to construe the term "future wages" in section 3 as no more than a variation of the more specific terminology used in the preceding section 2, viz. "wages or salary to be earned in the future".[9] Thus where section 2 refers to

---

**6.** The Massachusetts rule follows the general proposition that "all that is necessary is for the assignor so to express himself as to indicate an intention then and there to transfer his right to the assignee". 4 Corbin on Contracts § 879 (1951). *See* 3 Williston on Contracts § 424 (1960).

**7.** Mass.Gen.Laws Ann. ch. 154, § 2, provides in full:

"No assignment of or order for wages or salary to be earned in the future to secure a loan of less than three thousand dollars shall be valid against an employer of the person making such assignment or order until the assignment or order is accepted in writing by the employer, nor until the assignment or order and the acceptance of the same have been filed and recorded with the clerk of the city or town where the person making the assignment or order resides if he is a resident of the commonwealth, or in which he is employed if he is not a resident thereof; nor shall it be valid unless said assignment is substantially in the form prescribed in section five. No such assignment or order shall be recorded by the clerk of a city or town

unless it states on its face that the sum of ten dollars per week, as earned, of the wages or salary so assigned is exempt from such assignment or order. No such assignment or order shall be valid when made by a married man unless the written consent of his wife to the making thereof is attached thereto. No such assignment or order shall be valid for a period exceeding one year from the making thereof. The fee for the filing and recording of such assignment shall be as provided by clause (2) of section thirty-four of chapter two hundred and sixty-two."

**8.** Section 3 is reproduced in full in note 4, *supra.*

**9.** Section 2 derives from "An Act to Regulate Further the Business of Making Small Loans", 1908 Mass.Acts ch. 605, while section 3 derives from a series of acts "Relative to the Assignment of Wages", *e. g.,* 1905 Mass.Acts ch. 308. The two pieces of legislation containing the same language disparity as at present, were soon combined into one chapter, 1910 Mass. Acts ch. 563, and later the interrelationship

any assignment of "wages or salary to be earned in the future" to secure a loan of under three thousand dollars, section 3 applies to all *other* assignments of "wages or salary to be earned in the future". Under this interpretation, Nance's 1972 assignment of income already earned would not be subject to the requirements of section 3.

Our reading finds strong support in the remaining language of section 3. Three of the stated conditions for validity of an assignment would make little sense if read to apply to the assignment of deferred income occurring after the assignor had a vested right to it.

█ One such condition is that "Three fourths of the weekly earnings or wages of the assignor shall at all times be exempt from such assignment or order, and no such assignment or order shall be valid which does not so state on its face." As applied to an assignment of wages to be earned in the future, the exemption serves the clear purpose of protecting the assignor and his family from deprivation, suffering or a "hopeless condition of quasi-slavery" caused by one unwise assignment. R. Smith, *The History and Purpose of the Wage Assignment Statutes with a Suggestion for an Amendment*, 5 Mass.L.Q. 479, 485 (1920). No similar purpose would be served by applying the exemption to an assignment of income which the assignor has already earned but the receipt of which has been postponed past the usual payment cycle. After assigning a claim to deferred income, the assignor remains employable and his weekly wage or salary would not be affected; there is no risk that the assignment will plunge him or his family into deprivation, suffering or a "hopeless condition of quasi-slavery".

Section 3 provides further that "No such assignment or order shall be valid unless the written acceptance of the employer of the assignor" is endorsed on or attached to the assignment. Giving the employer a veto over an employee's assignment of his wages to be earned in the future can be justified on two grounds: the employer's paternalism might protect the employee from entering into an unwise assignment, and the employer has an interest himself in avoiding the impact on an employee's morale caused by an assignment. While the first ground might arguably be relevant in some cases where the income has already been earned, the employer's interest in not having his employees assign their income is relevant only if the assignment is of wages to be earned in the future. An employer might not want his employee to feel that he is working for the benefit of the assignee department store or credit house rather than for his own benefit. But if the employee's weekly check is not affected by an assignment, as in the case of deferred income, there is little likelihood of employee discontent. The statute, moreover, does not deal with the question of which employer to notify—present or former—if the assignor, as here, has moved on to another job. The present employer would have little reason to interfere, and the previous employer, while having an obvious interest in the subject of the assignment, has no strong interest in accepting or not accepting his former employee's decision to assign the claim.

Finally, reading section 3 as applying to Nance's assignment of his claim to deferred income would make it difficult to adhere to the requirement that an assignment covered by the section must be executed "in the standard form set forth in section five".[10]

between the two was clarified by making section 3 applicable only to an assignment "other than one subject to the preceding section", 1929 Mass.Acts ch. 159. While the separate genesis of the two provisions makes it possible that each was intended to have different scope, the absence of any indication that such was the case, and the fact that they have now co-existed in the same statute for almost seventy years, makes it reasonable to construe the two sections *in pari materia*. Had the legislature in-

tended the language in section 3 to be read as anything but a shorthand version of that in section 2, we might have expected any distinction to have been spelled out when the relationship between the provisions was clarified by amendment in 1929.

10. Mass.Gen.Laws Ann. ch. 154, § 5, provides in relevant part:

   "I . . . do hereby assign and transfer . . . all claims and demands, not exempt

The standard form permits assignment of "all claims and demands . . . against my present employer, and against any person whose employ I shall hereafter enter." Since Nance was no longer in the employ of the New England Patriots when he assigned his claim to deferred income, the standard form could not be used to effect an assignment of his claim. If section 3 were read to apply, Nance would therefore be unable to assign his claim; in order to be valid, the assignment would have to be executed "in the standard form", but the standard form would be incapable of effecting the assignment.[11]

It thus appears that to read section 3 as applying to an assignment of deferred income that has been fully earned would raise perplexing problems in trying to construe and apply the conditions for validity set forth in the section. The whole thrust of section 3, as evidenced by those conditions, is to protect a wage earner from assigning away in advance his entire means of supporting himself and his family. Its application is essentially prospective, bind-

ing, as section 7 of chapter 154 specifies, "all wages earned by the assignor within the period named in such assignment". We accordingly do not read the statutory language as applying to Nance's assignment of his 1970 and 1971 income which had been fully earned in the past. *Cf. Allen v. Chicago Pneumatic Tool Co.*, 205 Mass. 569, 91 N.E. 887 (1910).

## III

The remaining issue concerns whether Nance's actions amounted to a "willful and malicious injur[y]" to the bank's property within the meaning of section 17(a)(2) of the bankruptcy act.[12] Nance argues that his retention of the $24,000.09 was entirely reasonable in light of the bank's advice to him in February, 1973 that its claim to the deferred income had not been perfected and that additional steps would have to be taken to assure that it held a valid assignment. If the bank thought it had no legally enforceable interest, Nance asks, how can it be said that he willfully and maliciously

---

by law (which I now have, and all) which within a period of . . . from the date hereof I may and shall have against my present employer, and against any person whose employ I shall hereafter enter. . ."

11. Ironically some support for the argument that the term "future wages" contained in section 3 covers an assignment of deferred income can be found in language contained in the standard form of assignment which covers "all claims and demands . . . which I now have . . . against my present employer". This clause suggests that claims for income which has already been earned may be included in any assignment executed according to the standard form. We agree with that construction, at least insofar as it applies to claims for income already earned but not yet paid out according to the usual payment cycle. But the fact that such a claim must be included as part of a larger assignment of wages to be earned in the future from the same employer does not mean that an assignment of a claim to deferred income to be paid out over a ten-year period commencing five years after the income has been earned is covered by section 3. Where, as here, the assignment of deferred income is made at some date after the assignor has left the employ of the one liable for paying the deferred income, the standard form's reference to "all claims and demands . . . which I

now have . . . against my present employer" would be inappropriate for the assignment in question.

12. There can be little doubt that an assignor's retention of funds previously assigned to a third party amounts to an "injury" to the property of the assignee within the meaning of section 17(a)(2) of the Bankruptcy Act.

"Where an employee, in good faith and for a valuable consideration, sells, transfers, and assigns his title and right to possession of a stipulated amount of salary due him by his employer, and thereafter collects the money thus transferred, he cannot, as against a suit for recovery of the money, avail himself of a discharge in bankruptcy as a defense. The instrument of transfer is an assignment of title. . . . One who thus disposes of property without the authority of its owner . . . is guilty of a willful and malicious injury to property, within the meaning of [section 17(a)(2) of the] Bankruptcy Act . . ., and consequently his liability is not released by a discharge in bankruptcy."

*Covington v. Rosenbusch*, 148 Ga. 459, 97 S.E. 78, *decision in conformity to answers to certified questions*, 22 Ga.App. 799, 97 S.E. 462 (1918). *See generally McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916).

converted the bank's property. "[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. . . There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed." *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).

The findings of the bankruptcy judge provide the answer to the bankrupt's argument. On the conflicting evidence, the bankruptcy judge found, as he was entitled to do, that Nance had intended to make an assignment and had even represented to the bank that he would collect the funds on behalf of the bank. If so, and if, as found, the bank "in reliance on his representations had not notified the Patriots but looked to him to collect and turn over the proceeds", there is little shelter for Nance under the alleged confusion as to whether, in some hyper-legal sense, he could wiggle out of his undertaking. Nance's retention of the funds was "a willful disregard of what [he knew] to be his duty, an act which [was] against good morals and wrongful in and of itself, and which necessarily cause[d] injury and [was] done intentionally". *Tinker v. Colwell,* 193 U.S. 473, 487, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1904). There need be no showing of "special malice" toward the injured party, only that the act "is done deliberately and intentionally in knowing disregard of the rights of another". *Bennett v. W. T. Grant Co., supra,* 481 F.2d at 665. We therefore affirm the bankruptcy judge's conclusion that Nance's retention of the $24,000.09 was a "willful and malicious" injury to the bank's property.

*Reversed.*