In re John J. PINEAU, Debtor.

**KNIGHT KITCHEN MUSIC,**
**et al., Plaintiffs,**

v.

**John J. PINEAU, Defendant.**

Civ. No. 92–0169–B.
Bankruptcy No. 91–10704.

United States District Court,
D. Maine.

Jan. 5, 1993.

Robert J. Keach, James G. Goggin, Verrill & Dana, Portland, ME, Richard H. Reimer, Samuel L. Pinkus, New York, NY, for plaintiff.

Peter C. Fessenden, Ranger, Fessenden, Copeland and Smith, Brunswick, ME, for defendant.

ORDER AND MEMORANDUM
OF OPINION

BRODY, District Judge.

This matter is before the Court on Plaintiffs' appeal from a Judgment of the Bankruptcy Court. This Court has original and exclusive jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 158.

Plaintiffs/Appellants pursue this appeal through their agent, the American Society of Composers, Authors and Publishers ("ASCAP").[1] ASCAP petitioned the Bankruptcy Court to establish that Debtor/Appellee, John J. Pineau, was indebted to it for willful infringement of copyrights and that the obligation was excepted from discharge under 11 U.S.C. § 523(a)(6). ASCAP also sought to liquidate its claims for statutory damages and to obtain injunctive relief under the copyright statute, 17 U.S.C. § 501 et seq. After trial, the Bankruptcy Judge determined that although Pineau willfully infringed copyrights by broadcasting performances of copyrighted songs without a license, his actions were not imbued with the malice requisite to establish nondischargeability. Because the Bankruptcy Judge found the claim dischargeable, ASCAP's claim for damages was not addressed. The Bankruptcy Judge also held that injunctive relief would be inappropriate because it would do no more than require Pineau to obey the copyright laws in the future. We are persuaded that Pineau's actions were sufficient to support a finding of implied malice and, therefore, *REVERSE.*

## I.  FACTUAL BACKGROUND

Appellants hold valid copyrights for ten songs which were broadcast by radio stations WKIT–AM and WKIT–FM, after Appellants' agent, ASCAP, terminated the stations' license to broadcast the songs. Appellee was the sole shareholder of Sunspot Broadcasting, Inc. ("Sunspot"), the entity which owned the radio stations.

After Sunspot acquired the radio stations, it entered into a blanket licensing agreement with ASCAP. The agreement, dated May 20, 1987, allowed Pineau's stations to broadcast all the songs in ASCAP's library. By late 1988, the stations were in arrears on their licensing fees. ASCAP terminated the licenses on March 8, 1989. Two weeks later the stations cured the arrearages and sought to have their licenses reinstated. Since Sunspot no longer owed license fees to ASCAP, ASCAP reinstated the licenses pursuant to the terms of the ASCAP Consent Decree under which ASCAP *must* grant music users licenses to perform any and all of the copyrighted musical works in its repertory. *See United States v. ASCAP,* 1950–51 Trade Cas. (CCH) Paragraph 62,595 (S.D.N.Y. March 14, 1950).

On June 1, 1989, ASCAP informed Pineau that his stations owed additional licensing fees, including monthly charges and adjustments to 1988 fees. On August 7, 1989, a second notice of default was sent to Sunspot, declaring that, without payment in full, its stations' licenses would be terminated in thirty days. Through Pineau, Sunspot promised to pay past due fees in installments. ASCAP agreed to forbear. By October, Pineau had not made any payments. ASCAP's Senior Account Executive, David Bander, informed Pineau that if payments were not made toward curing the default, certified notice of termination would be sent pursuant to the August 7, 1989 notice of default. ASCAP's Stations Relations Representative, John Willett, discussed the situation with Pineau in November and December, 1989. On January 5, 1990, Pineau told Willett that he would be unable to make a sizeable reduction in the arrearage.

On January 26, 1990, Bander wrote to Pineau, informing him that the stations' licenses were terminated pursuant to the August 7, 1989 notice of default. ASCAP sent a formal termination notice under sep-

1. Plaintiffs are the owners of copyrights of songs allegedly broadcast by Defendant in violation of the copyright laws. Each plaintiff is a member of ASCAP. Although Defendant challenged ASCAP's agency in the underlying action, the Bankruptcy Court found that Defendant has long acknowledged this agency for purposes of licensing broadcasts of copyrighted songs.

arate cover that same day. After this notification, Pineau continued to file annual reports with ASCAP and communicated with ASCAP regarding the stations' obligation to ASCAP.

On April 23, 1990, Bander wrote to Pineau acknowledging that ASCAP had received the stations' annual reports for 1989 and informing Pineau that the balance due ASCAP was $8,612.20, subject to audit. Bander stated that ASCAP accepted the reports for "informational purposes only" and reminded Pineau that, "Until such time that full payment is received, WKIT-AM/FM will remain unlicensed, and any performances of our members (sic) copyrighted musical compositions without advance written permission, have constituted, and will continue to constitute infringements under the United States Copyright Law." *In re Pineau*, 141 B.R. 522, 525 (Bankr.D.Me.1992).

On September 17, 1990, Bander informed the stations of copyright violations it had tracked after terminating Sunspot's licenses. Bander offered to "resolve claims for infringement arising from these and other unauthorized performances on the basis of retroactive licensing upon payment of license fees and reimbursement of ... monitoring expenses." *Id.*

Sunspot remained in default. ASCAP initiated a civil copyright infringement suit against Pineau, seeking statutory damages and injunctive relief. On September 5, 1991, Pineau filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. Pineau's petition automatically stayed the prosecution of the copyright infringement action. Pursuant to § 301 of the Code, an Order of Relief was entered for Pineau. Thereafter, ASCAP filed a Motion for Relief from Automatic Stay to continue the civil case against Pineau in order to obtain a final judgment and to proceed with any necessary appeals.

By Order dated September 10, 1991, Bankruptcy Judge Goodman denied AS-CAP's Motion for Relief from Automatic Stay.

On December 20, 1991, ASCAP filed an adversary proceeding under Fed.

R.Bankr.P. 7001 *et seq.*, seeking a determination of nondischargeability of the claim ("debt"), resulting from Pineau's willful copyright infringement under Title 17 of the United States Code. On April 23, 1992, a bench trial was held before Bankruptcy Judge, James B. Haines, to determine this issue.

On June 9, 1992, the Bankruptcy Court filed its Memorandum of Decision and Judgment determining that the debt was dischargeable. On June 22, 1992, ASCAP filed a Motion to Amend the Judgment. The Bankruptcy Court subsequently denied this Motion and this appeal followed.

## II. STANDARD OF REVIEW

When reviewing a bankruptcy judge's decision in a core proceeding, a district court reviews matters of law *de novo*. *See In re First Software Corp.*, 97 B.R. 711 (Bankr. D.Mass.1988). *De novo* review requires the court to make a judgment independent of the bankruptcy court's decision and without deference to that court's analysis and conclusions. *In re England*, 141 B.R. 495, 497 (N.D.Tex.1991), *aff'd*, 975 F.2d 1168 (5th Cir.1992). "When facts relevant to an appeal are undisputed, the only subjects of review are the bankruptcy court's conclusions of law." *Id.* (footnotes omitted).

The issue under review is whether Pineau's actions were sufficient to support a finding of implied malice. The actions in question are undisputed. What is disputed is the Bankruptcy Court's application of 11 U.S.C. § 523(a)(6) in regard to these actions. Accordingly, the decision is reviewable *de novo*.

## III. DISCUSSION

11 U.S.C. § 523 provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(6) For willful and malicious injury by the debtor to another entity or to the property of another entity....

To establish a § 523(a)(6) discharge exception, willfulness and malice must not be lumped together to create an amorphous standard preventing discharge for any conduct that a court may consider deplorable. *In re Long,* 774 F.2d 875, 881 (8th Cir. 1985).

■ In applying the "willful" prong of § 523(a)(6), courts generally agree that "willful" means "deliberate or intentional". *See, e.g., In re Britton,* 950 F.2d 602, 605 (9th Cir.1991). The Bankruptcy Court found that Pineau satisfied § 523(a)(6)'s "willfulness" requirement when he deliberately and intentionally directed that copyrighted material be played without a valid license. We agree that this conduct satisfies § 523(a)(6)'s "willfulness" prong.

Prior to the enactment of the new Bankruptcy Code, the leading case in which the Supreme Court considered the "malicious" prong of the discharge exception was *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904).[2] The *Tinker* Court held that in the case of certain wrongful acts, the debtor may establish "just cause or excuse" and, thereby, preclude a malice conclusion which otherwise would be compelled. *Id.* at 485–86, 24 S.Ct. at 508 (citations omitted). *Tinker* also recognized that, although maliciousness is a separate element of the exception, some deliberate acts are so inherently wrongful, the law presumes that one who performs them acted with malice. *Id.* The First Circuit has followed *Tinker. In re Nance,* 556 F.2d 602, 611 (1st Cir.1977).

■ Appellants argue that malice should be implied from Appellee's acts of willful copyright infringement. In this regard, Appellants do not take issue with the Bankruptcy Judge's analysis of "imputed" or "implied" malice. We do. While we do not reverse the Bankruptcy Court's analysis of the implied malice standard, we are not fully persuaded by its reasoning.

There are four different legal standards that courts have applied when determining "maliciousness" under § 523(a)(6). *See generally In re Horldt,* 86 B.R. 823 (Bankr.E.D.Pa.1988) (One standard requires proof from the creditor that the debtor acted with the specific intent to injure the creditor. A second view is that the creditor need only prove that the debtor acted without just cause or excuse. A third approach requires that the debtor's conduct target the creditor, at least in the sense that the conduct was certain or almost certain to cause financial harm. A fourth approach, which has been characterized as a "totality of the circumstances" approach, adopts the position that an injury is malicious if the debtor fails to act in subjective good faith.). Some of the distinctions between these legal standards are quite subtle.

The Bankruptcy Court found that those cases which determined malice based on an objective standard were better reasoned. The Bankruptcy Court relied on *In re Nance* to support its contention that the First Circuit would adopt an objective approach when determining implied malice under § 523(a)(6) and reject reasoning such as that in *In re Long,* which examines the debtor's subjective state of mind to some extent.

The First Circuit's opinion in *Nance* states that "[t]here need be no showing of 'special malice' toward the injured party, only that the act 'is done deliberately and intentionally in knowing disregard of the rights of another.' " *In re Nance,* 556 F.2d at 611 (quoting *Bennett v. W.T. Grant Co.,* 481 F.2d 664, 665 (4th Cir.1973)). Examining whether "special malice" exists would require an inquiry into the debtor's mindset and, to this extent, we agree the First Circuit would reject such an inquiry as too subjective. However, because *Nance* allows for a finding of malice when a debtor *knowingly* disregards the rights of another, we are not persuaded that *Nance* necessarily precludes an examination of some subjective factors when determining whether the requisite malice exists. For this reason, we are not persuaded that the Bankruptcy Court is correct in finding *Nance* would preclude the First Circuit

**2.** *Tinker* examined when a debt was excepted from discharge under § 17(a)(2) of the Bankruptcy Act of 1898. Section 17(a)(2) is the predecessor of § 523(a)(6).

from adopting a standard similar to that applied in *In re Long,* 774 F.2d 875 (8th Cir.1985).

*Long* adopts an intermediate position finding the requisite malice when a debtor intends *or* fully expects to harm the economic interests of the creditor. *Id.* at 882. *Long's* malice standard requires that the debtor's conduct be targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm. *Id.* at 881. Therefore *Long* does not require the finding of "special malice" (i.e., a subjective *intent to harm* the injured party) rejected in *Nance.*[3]

The New Hampshire District Court followed the *Long* approach in *In re McLaughlin,* 109 B.R. 14 (Bankr.D.N.H. 1989). In rephrasing *Long's* standard, *McLaughlin* concluded:

> [T]o establish a ground for nondischargeability of a debt under § 523(a)(6) of the Bankruptcy Code it must be proven that the debtor engaged in deliberate acts which he knew were certain or substantially certain to result in injury to property. If this is established the debt will remain nondischargeable even though the resulting harm was not the *primary* purpose of the intentional acts.

*Id.* at 17 (emphasis in original). The *McLaughlin* approach is persuasive and consistent with *In re Nance.* Whether the First Circuit follows a *Long* -type analysis or an approach more like the Bankruptcy Court's, Pineau's conduct would be found to imply malice under either standard.

While *Tinker* held that a finding of implied malice is sufficient for purposes of the discharge exception, *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), instructs that a court must look at all of the pertinent circumstances in determining whether the requisite malice inheres in conduct giving rise to liability. Although *Davis* dealt with the conversion of a secured lender's collateral, the Bankruptcy Court found *Davis* determinative citing the following language:

[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice.... There may be an honest, but mistaken belief engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*In re Pineau,* 141 B.R. at 528 (quoting, *Davis,* 293 U.S. at 332, 55 S.Ct. at 153).

In *Davis,* a secured lender argued that the debtor's sale of collateral without the consent required by loan documents, constituted a willful and malicious injury to its property and, therefore, created a nondischargeable obligation. However, the Court held that because the parties' past course of dealing involved many occasions in which the debtor sold the lender's collateral upon like terms and without the express consent of the lender, malice had not been shown. *Davis,* 293 U.S. at 332, 55 S.Ct. at 153.

The Bankruptcy Court concluded that although Pineau acted wrongfully in the face of Appellants' rights when he willfully infringed Appellants' copyrights, he did so with justification or excuse grounded in a course of dealing with ASCAP. Because ASCAP encouraged Pineau to cure his default with the promise of retroactive license reinstatement, the Bankruptcy Court concluded that Pineau had good grounds to believe that ASCAP informally consented to the operation of the stations to generate revenues to "pay up".

We believe this analysis is flawed for several reasons. First, even if it could be argued that ASCAP informally consented to the operation of Pineau's stations, it does not follow that ASCAP necessarily consented to the use of its material in that operation. Second, we do not agree that

---

**3.** In *In re Remick,* 96 B.R. 935, 941 (Bankr. W.D.Mo.1987), the Court read the *Long* decision "to work a substantial alteration in the law whereby the former 'subjective' standard is no longer followed and a more salutary rule is to be employed whereby the debtor is responsible for the natural effect of his or her actions."

ASCAP's actions can be characterized as informal consent to Pineau's continued operation of the stations without paying the past due license fees. The facts as found by the Bankruptcy Court show that ASCAP insisted on full contractual compliance and warned Pineau that a copyright infringement suit would follow if he failed to fully comply with his obligations. Appellants adhered to their warning and instituted a copyright infringement action. Although ASCAP offered to reinstate Pineau's licenses post-default upon full payment, this was clearly a final attempt to settle its claim before seeking redress through litigation and not a pattern of waiver and acquiescence as was the case of the creditor's conduct in *Davis.* Further, ASCAP was obligated under a Consent Decree to grant licenses to all those who requested them upon receipt of payment. *See United States v. ASCAP,* 1950–51 Trade Cas. (CCH) Paragraph 62,595 (S.D.N.Y. March 14, 1950). Therefore if Pineau cured his default and sought reinstatement, ASCAP was under a legal obligation to grant him such reinstatement. If a creditor's compliance with a legal requirement constitutes a "course of dealing which induces an honest, but mistaken belief ... that powers have been enlarged or incapacities removed" under *Davis,* creditors will be forced to decide between ignoring their legal obligations or forgoing their right to have a claim determined to be nondischargeable. We do not believe *Davis* was meant to force creditors to make such a choice or to penalize creditors for attempting to settle a claim before seeking recourse in the courts.

*Davis* suggests implied malice cannot be found if a course of dealing provides a debtor with a legitimate expectation or belief that his conduct will be forgiven or excused, or that he acted with the creditor's consent. Unlike the Bankruptcy Court, we are not satisfied that such a course of dealing can be found from these facts. The record shows ASCAP insisted on full compliance with its licensing agreements and the copyright laws. When Pineau's compliance fell short, ASCAP moved swiftly to terminate the licenses and enforce those laws.

*Davis* established that a conversion of property is not enough in itself to prevent discharge of a debt. However, *Davis* did not establish precisely what type of conduct would be sufficiently egregious to constitute malice in the conversion context. More importantly, *Davis* obviously did not even address the copyright infringement context.

The Bankruptcy Court stated that Pineau clearly knew and appreciated Sunspot's stations' need for a valid license in order to broadcast performances of copyrighted works in the ASCAP library, and when the stations infringed ASCAP's copyrights, it was done at Pineau's direction. *In re Pineau,* 141 B.R. at 530. The Bankruptcy Court noted that while other bankruptcy courts have found it unnecessary to go much further to find copyright infringement liability excepted from discharge under § 523(a)(6), a number of facts distinguish this case. *See In re Elms,* 112 B.R. 148 (Bankr.E.D.La.1990); *In re Gabaldon,* 55 B.R. 431 (Bankr.D.N.M.1985); *Jubilee Communications, Inc. v. Lynch,* 16 U.S.P.Q.2d (BNA) 1971 (Bankr.W.D.Okla. 1990). For example, the Bankruptcy Court found it noteworthy that unlike the debtor in *Gabaldon,* Pineau did not ignore the copyright laws and demands of ASCAP. We do not believe this difference is decisive. While Pineau may not have attempted to hide from ASCAP, he did ignore ASCAP's demand to cease playing its songs.

The Bankruptcy Court also found this case to be distinguishable from *Elms* because, unlike the debtor in *Elms,* Pineau registered with the authorities that regulated the infringing activities. We are not persuaded that Pineau's actions are distinguishable merely because he initially complied with a legal obligation. Even if Pineau's willful infringement began at a later stage in the licensing/registration process than Elms' infringement, both debtors knowingly infringed the copyright laws, and it is this conduct which is determinative.

*Elms* and *Gabaldon* held debts nondischargeable when a debtor had knowledge of his legal obligations because the debtor's violation of the federal copyright law

was an "aggravating feature which evinces a voluntary willingness to inflict injury." *In re Elms*, 112 B.R. at 152; *In re Gabaldon*, 55 B.R. at 433. Pineau had knowledge that he was legally obligated to pay ASCAP *before* broadcasting the songs involved in this claim. By not paying AS-CAP before broadcasting the songs, Pineau could expect that ASCAP would be financially injured even if he intended to later redress any injury. Pineau's voluntary willingness to disregard ASCAP's rights by playing the songs without paying, warrants a finding of implied malice under either the *Bennett* standard, as cited in *Nance*, or the *Long* approach. For this reason, and because we find the *Davis* "exception" to be inapplicable, Pineau's obligation arising from the infringement of Appellants' copyrights is nondischargeable.

Accordingly, we *REVERSE* the Bankruptcy Court's decision and *REMAND* the case for a determination of whether, and to what extent, statutory damages, injunctive relief and attorneys' fees should be awarded.

SO ORDERED.