In the Matter of Jeffrey Earl BURDICK, Sr., Wanda Burdick f/d/b/a/ Busy B. Dairy Farms, Busy B. Farms, Debtors.

J. Richard COFFING and Gladys Coffing, Plaintiffs,

v.

Jeffrey Earl BURDICK, Sr., and Wanda Burdick, Defendants.

Bankruptcy No. 81–31384.
Adv. No. 82–3034.

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

Sept. 2, 1986.

**106**

Jeffrey G. Price, Peru, Ind., for plaintiffs.

David A. Foelber, Valparaiso, Ind., for defendants.

### ORDER

ROBERT K. RODIBAUGH, Chief Judge.

This matter is brought before the court on the Complaint to Determine dischargeability of Debt filed by J. Richard Coffing and Gladys M. Coffing (Plaintiffs) on February 11, 1982. Trial was held on March 12, 1984. On October 10, 1984, the matter was taken under advisement.

### BACKGROUND

In September of 1979, Jeffrey Burdick (Defendant) desired to expand his dairy cattle herd. Accordingly, he entered into an agreement with the plaintiff under which he would purchase 39 milk cows from the plaintiff for $70,000.00. Payment for the cows was to be made out of the defendant's milk consignment. If the defendant failed to make the monthly payments, the plaintiff retained the right to repossess the cattle.

A security agreement was entered into between the parties which gave the plaintiff a security interest in the cattle or "equal cattle of the same value." The plaintiff also retained the right under this security agreement to repossess the cattle upon the defendant's failure to make monthly payments.

Prior to entering into the agreement with the plaintiff, the defendant had entered into security agreements with the Farmers Home Administration (FmHA) and with the State Exchange Bank (Exchange Bank), which gave FmHA and Exchange Bank security interests in all cattle, calves, and after-acquired cattle. These security interests were perfected by filing, as was the plaintiff's interest.

From the beginning of the payment schedule under the agreement with the plaintiff, the defendant was late in making payments.[1] In April 1980, the defendant's payment was short. Upon notice by the plaintiff, the defendant paid the outstanding April payment with a personal check. By June of 1980, the defendant was delinquent on payments and has remained delinquent since.

The defendant attributes the failure to make payments to have been caused by the fact that the cattle which he purchased from the plaintiff were not producing as much milk as expected. Indeed the evidence indicates that the cattle suffered breeding problems, mastitis and behavioral disorders which rendered several of the cows either incapable of producing milk at all or unable to produce enough milk to warrant their continued upkeep as dairy cattle. While the testimony of the veterinarians for the plaintiff and the defendant vary in some respects, it is clear that the defendant ran at least an average dairy operation and that the low milk production was not the result of any mishandling or neglect on the part of the defendant.

As is customary in dairy operations, nonproductive cows are culled. That is to say, the cattle are sold as beef cattle through a consignment process. Between December 1979 and July 1980, the defendant culled sixteen of the cattle on the advice of his

---

**1.** The record indicates that the first payment was due on November 1, 1979, but was not paid until November 19, 1979 due to the fact that the milk consignment was not made until after November 1, 1979.

veterinarian and received approximately $9,000.00 in proceeds. These proceeds were placed in the defendant's checking account and used primarily to pay veterinary bills to purchase additional feed, and to pay the plaintiff the amounts the milk consignments were short in May and June of 1980.

In June of 1980, the defendant realized that his milk production had become critically low. This, coupled with the fact that the defendant's wife suffered a stroke, placed the defendant in a financial crisis. Seeking to be relieved of this crisis, the defendant notified all of his creditors of his financial problems and requested an agreement to a liquidation sale. FmHA, Exchange Bank, and the plaintiff all agreed to the sale.

The sale was held in a very professional manner. Advertisements were made, an auctioneer hired, and sales receipts dutifully accounted for by the clerk of the sale. However, prior to the sale, the plaintiff sought to repossess the cattle through self-help. This attempt was halted through the intervention of the county sheriff.

The foiled plaintiff then sought repayment or replacement of security by the defendant. The testimony greatly conflicts on the agreement reached by the parties prior to the liquidation sale. The plaintiff maintains that the defendant promised to have $30,000.00 in the plaintiff's bank account by the next morning. The defendant, on the other hand, maintains that he offered the plaintiff the proceeds of crops which the defendant had growing plus other payments as they could be made. Based on the testimony, the demeanor and candor of the witnesses, the court finds that the plaintiff's version is an unlikely rendition of what transpired and that the defendant's explanation more accurately depicts the final agreement of the parties.

In either event, the liquidation took place, and the plaintiff received proceeds of $29,200.00 for 22 cows sold. Since May of 1982, the plaintiff has been receiving pay-ments from the defendant's father to cover the $37,655.00 difference between the outstanding principle and the liquidation sales proceeds.

 Fifteen months following the liquidation sale, the defendant's financial situation had not improved. Accordingly, he and his wife filed a joint bankruptcy petition. The plaintiff has filed his Complaint stating that by culling the 16 cows, the defendant has engaged in a willful and malicious conversion which renders the remaining debt nondischargeable under 11 U.S.C. § 523(a)(6).[2]

### DISCUSSION

Section 523(a)(6) of the Bankruptcy Code provides in part:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

Legislative history reflects that § 523(a)(6) was intended to include willful and malicious conversion. S.Rep.No. 989, 95th Cong., 2d Sess. 77 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787. Thus, in order for the plaintiff in this action to prevail under § 523(a)(6), it must be shown by clear and convincing evidence that the defendant converted the cattle covered by the plaintiff's security interest and that this conversion was both willful and malicious. The analysis must therefore turn to whether these three requirements have been met in the present case.

 A conversion, quite simply, is an unauthorized act which deprives an owner of his property permanently or for an indefinite time, or an unauthorized and wrongful exercise of dominion and control over another's personal property to the ex-

---

**2.** Actually, the proper measure of nondischargeable debt would be the value of the property at the time it was converted, which in this case is substantially less than the balance on the debt.

clusion of or inconsistent with the rights of the owners. *Yoder Feed Service v. Allied Pullets, Inc.*, 171 Ind.App. 692, 359 N.E.2d 602 (1977).

■ Here the defendant culled nonproductive cattle and did not directly pay the proceeds to the plaintiff.[3] Thus, the plaintiff was deprived of his right to the property under the terms of the security agreement. However, for a conversion to exist, it must be shown that the appropriation of property was unauthorized or without the consent of the plaintiff. Nowhere in the security agreement does the plaintiff deny the defendant the right to cull nonproductive cattle. Neither does the security agreement authorize culling. The court is placed in the difficult position of deciding what the intention of the parties was with regard to culling.

Indiana Code § 26-1-2-202 provides in part:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(a) By course of dealing or usage of trade (I.C. 26-1-1-205) or by course of performance (I.C. 26-1-2-208)....

I.C. 26-1-2-202 (Burns 1986 Supp.)

Under § 26-1-1-205 of the Indiana Code a "usage of trade" is "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." I.C. § 26-1-1-205(2) (Burns, 1974).

■ Thus, when an agreement such as the one presented fails to address a matter, the court is free to refer to the usage of trade as a "gap filler" to resolve the dilemma. *Parker v. Rod Johnson Farm Service, Inc.*, 179 Ind.App. 190, 384 N.E.2d 1129 (Ind.App.1979). Here, the overwhelming evidence indicates that culling cattle is a regular practice in the dairy industry. The testimony of veterinarians and loan officers indicates that normally 25–35% of a herd will be culled out each year. In the present case, 41% of the cattle in question were culled. While this percentage is slightly over the "average," the court does not feel it is unreasonable in light of the nonproductive condition the cows were in when the defendant received them. As such, the court finds that the culling of the 16 cows was within the usage of trade and was therefore authorized by the agreement.[4]

The court accordingly finds that there was no conversion on the part of the defendant inasmuch as any deprivation of the plaintiff's right to the cattle was not unauthorized.

Even if the culling amounted to a conversion, the plaintiff is not entitled to have the debt declared nondischargeable under 11 U.S.C. § 523(a)(6) because the conversion would not amount to a "willful" and "malicious" act on the part of the defendant.

■ To be "willful" under § 523(a)(6), the act of conversion must be "deliberate or intentional." H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977); S.Rep.No. 989, 95th Cong. 2d Sess. 77 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787. The obvious import of this requirement is that the act must have been done intentionally and not negligently or accidentally. *See In re Hodges*, 4 B.R. 513, 517 (Bankr. W.D.Va.1980); *In re Vereen*, 43 B.R. 489, 491 (Bankr.M.D.Fla.1984).

---

**3.** As noted before, approximately $9,000.00 in cattle were culled. Of this, only approximately $1,700 was paid to the plaintiff.

**4.** Additionally, the agreement states that the security interest would cover the 39 cows or cows of equal value. It appears to the court that this reflects an acknowledgment by the plaintiff that the 39 original cows would not remain in the defendant's possession throughout the duration of the payment schedule.

What is problematical for courts and litigants is what is necessary to show that a conversion is malicious. The root of the uncertainty is the Supreme Court's holding in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the subsequent legislative history, and the cases interpreting both.

In *Tinker, supra,* the debtor sought to have a judgment for criminal conversion discharged under the former Bankruptcy Act § 17(a)(2).[5] The record had indicated that the debtor had no personal malevolence or ill will toward the judgment creditor. Nonetheless, the Court found the debt to be nondischargeable because the conversion was a "willful and malicious injury" to the property of the judgment creditor. The Court held:

> [W]e think a willful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.

*Id.* 193 U.S. at 487, 24 S.Ct. at 509.

The legislative history of § 523(a)(6) of the 1978 Bankruptcy Code indicates a congressional effort to overrule the holding in *Tinker.* The congressional report states:

> Paragraph (5) provides that debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, willful means deliberate or intentional. To the extent that *Tinker v. Colwell* (citation omitted) held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a reckless disregard standard, they are overruled.

S.Rep.No. 989, 95th Cong., 2d Sess. 79 (1978), *reprinted in* U.S. Code Cong. & Ad. News 5787, 5865; H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 6320.

The problem lies in determining whether § 523(a)(6) was designed to change the Supreme Court's holding that the "willful" element could be met by showing that the debtor acted in reckless disregard for the rights of the creditor or whether the entire holding, including the language which states that malice may be implied or constructive, was overruled by the 1978 Code.

One line of cases suggests that the entire *Tinker* holding was overruled. These cases hold that "willful" means intentional or deliberate and that "malicious" requires an actual intent to do harm. *See In re Hodges,* 4 B.R. 513, 516 (Bankr.W.D.Va. 1980); *see also In re Cecchini,* 37 B.R. 671 (Bankr. 9th Cir.1984).

The other line of cases views the legislative history as only obviating the "willfulness" holding of *Tinker* but keeping intact the implied or constructive malice holding. *See In re Scotella,* 18 B.R. 975, 977 (Bankr. N.D.Ill.1982); *In the Matter of Chambers,* 23 B.R. 206, 210 (Bankr.W.D.Wis.1982). The courts following this line favor the Collier test for determining the issue of malice. Quite simply, that test finds malice when there is "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse." 3 *Collier on Bankruptcy,* ¶ 523.16 (15th ed. 1984).

There is a marked difference in the degree of difficulty faced by a creditor in establishing malice under these two competing views. Under the first view, or actual malice view, a creditor would be faced with the "nearly insurmountable burden" of trying to show that the debtor harbored ill will or personal hatred toward the creditor which led to the conversion. *In re Egan,* 52 B.R. 501, 507 (Bankr.D. Minn.1985). This is particularly burdensome in light of the insistence that the creditor establish such malice by clear and convincing evidence. *See In re DeRosa,* 20 B.R. 307, 311 (Bankr.S.D.N.Y.1982).

On the other hand, requiring only a showing of implied or constructive malice

---

**5.** § 17(a)(2) is the predecessor to the current § 523(a)(6) of the Bankruptcy Code.

does not always lead to just results. The creditor is afforded the position of presenting to the court evidence of the nature of the conversion or evidence of the personal feelings of the debtor toward the creditor with the hope that a strong inference of an evil state of mind may be created. *In re Cline*, 52 B.R. 301 (Bankr.W.D.Ky.1985). While this is debatably acceptable, it is the unbridled use of such inferences which leads to harsh results.[6]

Determining the state of mind of a debtor is a difficult task. To base that determination on a hindsight examination of what objectively transpired, both in regard to the conversion and any justification or excuse the debtor may have had, ignores the fact that intent is to a large degree a subjective matter. Finding that a debtor acted maliciously simply because the creditor was harmed and the debtor was without an objective justification often misses the focus of the issue of intent. By the same token, however, for a court to rely solely on the testimony of a debtor regarding what he intended to achieve by the conversion is absurd.

■ The inherent unfairness of the competing views on what is necessary to establish a malicious conversion under § 523(a)(6) leads this court to reject the strict application of either view. Instead, this court chooses to make the determination of malice by looking at the totality of the circumstances.

The initial consideration is whether the debtor knew or should have known that the act constituting conversion was unauthorized. Depending on the circumstances, this may be done in different ways. In a non-commercial setting, the inquiry turns on whether a reasonable and prudent person would have known that the act complained of was unauthorized, or whether the debtor actually knew it was unauthorized. In a commercial setting, such as that presented here, the inquiry should be pursued with greater specificity. Relevant

documents such as security agreements, leases, or licenses, or other evidence should be considered to determine if the debtor was given fair notice of permitted and prohibited use of the property in question. The inquiry should not stop here though. The court should consider the commercial sophistication of the debtor as well. A debtor who participates in a particular type of commercial transaction for the first time is not as likely to fully understand the terminology used in commercial documents as is a seasoned businessman who regularly involves himself in such transactions. While both are bound by the terms of the agreements, the fledgling debtor is less likely to know that a certain use of the property is unauthorized. As such, there is less of a basis to find that the debtor intended to harm the creditor by engaging in that use.

The inquiry into the debtor's commercial sophistication is also of great assistance in determining the existence of malice when the debtor possesses admirable knowledge of the rights and duties involved in a particular type of transaction. For example, within a particular trade or business there may exist a custom or usage which leads the debtor to believe that the act constituting a conversion is entirely permissible. Right or wrong, the debtor is able to present a factual basis for his action. From this, the court is placed in a better position to determine if the debtor actually intended to harm the creditor.

Determining if the debtor knew or should have known that the use of the property was unauthorized by looking at what a reasonable and prudent person with the debtor's commercial sophistication would have known may also help prove a case of malicious conversion for the creditor. An agreement setting forth the rights and duties of the debtor with regard to the property in question may be silent on a specific use of the property. But, by showing that the debtor was commercially sophisticated with regard to the trade or business involved, and that it was customary in

---

**6.** In *In re Pommerer*, 10 B.R. 935, 941 (Bankr.D. Minn.1981) for example, malice was established by showing that the debtor knew the plaintiff had specific rights in the collateral and deliberately disregarded those rights.

that trade or business to prohibit the specific use without expressing it, the creditor may show that the debtor knew or should have known that the use was unauthorized.

Establishing through evidence and commercial sophistication that the debtor knew or should have known that the act constituting conversion was unauthorized creates only an inference that the debtor intended to harm the creditor.[7] The other fact which must be considered is whether the debtor acted in subjective good faith. That is to say, the court should inquire into the reason for the conversion. By this, the court does not mean to suggest that the debtor must have a legally cognizable justification or excuse. Justification and excuse are valid considerations in determing if a conversion even existed.[8] At this stage of the analysis, the court is concerned with whether the debtor intended to harm the creditor. It is a purely subjective inquiry in which the court is to consider any reason for the conversion which is propounded by the debtor, whether it is legally cognizable or not. The weight to be afforded to the reason is, of course, to be based solely on the credibility and demeanor of the debtor and other factual matters presented to the court. The court is not necessarily concerned with the logic of the debtor's propounded explanation but rather with whether the debtor acted with subjective good faith; that is to say, with a full heart and empty head.

Of course, showing by clear and convincing evidence that the debtor acted without good faith is a difficult task for a creditor, but the court is of the opinion that the burden is not insurmountable. Effective examination of the debtor coupled with the presentation of other evidence in rebuttal would surely lead to a conclusion of lack of good faith when the debtor truly intended to harm the creditor.

Holding that good faith vitiates a claim that a conversion is malicious is nothing novel. *In re Cline*, 52 B.R. 301, 303 (Bankr.W.D.Ky.1985); *United Bank of Southgate v. Nelson*, 35 B.R. 766, 776 (D.Ill.1983). What appears to be novel, however, is the framework in which good faith is being utilized. By removing it from the determination of whether the debtor had knowledge that the act constituting conversion was unauthorized,[9] or by requiring justification or excuse,[10] the court is focusing on the good faith inquiry in the proper light. Subjective good faith, with regard to § 523(a)(6), should not be cluttered with notions of objective knowledge or soundness, when in fact the ultimate question is whether the debtor's intent was to cause harm to the creditor.

This court has accepted the fact that it cannot delve into the mind of the debtor. But by considering the factors of whether the debtor knew or should have known that his use of the property was unauthorized and whether the debtor engaged in the act constituting conversion with a reason other than to harm the creditor, the court feels that it is in a better position to discover what was most likely the intent of the debtor at the time of the conversion than under the two existing views.

■ Turning now to the case at bar, the court finds no malice on the part of the

---

7. The creation of this inference is achieved through negative implication. It is not imaginable that a debtor could dispose of property in a manner which he believes is authorized with the intent to harm. Knowledge that the disposition is unauthorized is thus a prerequisite for a showing of malice. But standing alone, such knowledge is not enough to show malice; it only resolves the issue of *objective* good faith. It should be noted that knowledge based on commercial sophistication has been useful in other areas in which intent is a crucial issue. *See In re Davis* [1986] Bank.L.Rep. ¶ 71,221 (June 5, 1986) (punitive damages).

8. The late Dean Prosser pointed out that persons "must take the risk that there is no lawful justification for their acts" with regard to whether a conversion took place. Prosser & Keeton, *The Law of Torts*, 93 (5th ed.1984).

9. See *United Bank of Southgate v. Nelson, supra,* at 776 in which the court held that malice under § 523(a)(6) means that the "debtor knows his act would harm the creditors [sic] interest and proceeds in the fact [sic] of the knowledge."

10. See 3 *Collier on Bankruptcy,* ¶ 523.16 (15th ed.1984). This is more properly a consideration of objective good faith.

defendant in culling out the cattle. His commercial sophistication in the dairy business is impressive. The security agreement that he entered into with the plaintiff gave no notice that the cattle could not be culled. Further, there was no custom within the dairy industry which would put the defendant on notice that he could not cull the cattle. Indeed, the evidence indicates that culling was customarily permitted.[11]

Moreover, the evidence indicates that the defendant acted in good faith. His intention in culling the cattle was to avoid unnecessary loss of profits which would result from expending the same amount of money on feed while receiving less in milk consignments. The credibility and demeanor of the defendant leads this court to believe that it was not his intention to harm the plaintiff.

WHEREFORE, the plaintiff's Complaint to determine dischargeability is denied, and the debt is found dischargeable.

SO ORDERED.

---

**11.** Even if no such custom existed, the debtor introduced a sufficient factual basis for his belief that it was permissible: His prior creditors had always permitted culling without return of the proceeds.