In re John J. PINEAU, Debtor.

NIGHT KITCHEN MUSIC,
et al., Plaintiffs,

v.

John J. PINEAU, Defendant.

Bankruptcy No. 91–10704.
Adv. No. 91–1101.

United States Bankruptcy Court,
D. Maine.

June 9, 1992.
As Amended July 8, 1992.

David C. Hillman, James G. Googin, Verrill & Dana, Portland, Me., Richard Reimer, New York City, for plaintiffs.

Paul R. Copeland, III, Peter C. Fessenden, Ranger, Fessenden, Copeland & Smith, Brunswick, Me., for defendant.

JAMES B. HAINES, Jr., Bankruptcy Judge.

## MEMORANDUM OF DECISION

In this adversary action, plaintiffs seek to establish that the debtor, John J. Pineau, is indebted to them for willful infringement of copyrights, and that the obligation is excepted from discharge under 11 U.S.C. § 523(a)(6).[1] As an adjunct, they seek to liquidate their claims for statutory damages and to obtain injunctive relief.[2] After trial, the court concludes that, although Pineau willfully infringed copyrights by broadcasting performances of copyrighted songs without license to do so, his actions were not imbued with the malice requisite to establish non-dischargeability.[3]

### Facts

The facts are amenable to compact discussion. Plaintiffs hold valid copyrights for ten songs, recorded performances of which were broadcast by radio stations WKIT–AM and WKIT–FM on March 17, 1990, after the stations' license agreement,

---

1. Unless otherwise noted, citations to section numbers throughout this memorandum are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code"), as amended, 11 U.S.C. § 101 *et seq.* (1991).

2. Plaintiffs invoke the damages and injunctive remedies available under the federal copyright statute. 17 U.S.C. §§ 501, *et seq.*

3. This memorandum constitutes the Court's findings of fact and conclusions of law. F.R.Bankr.P. 7052.

obtained through plaintiffs' agent, the American Society of Composers, Authors and Publishers ("ASCAP"), had been terminated.[4]

Pineau was the sole shareholder of Sunspot Broadcasting, Inc. ("Sunspot"), the entity which owned the radio stations.[5] Although Pineau did not direct the details of the stations' day-to-day operations, he held final authority over its conduct and made decisions relating to programming.

When Pineau, through Sunspot, first acquired WKIT–AM and WKIT–FM he entered into a blanket licensing agreement with ASCAP, commencing May 20, 1987.[6] Under the so-called blanket license, the stations obtained unlimited permission to broadcast recordings of all songs in the ASCAP library.[7] By late 1988, the stations were in arrears of their licensing fee obligations to ASCAP and, on March 8, 1989, their license was terminated.[8] Two weeks later, when the stations cured the arrearages, ASCAP reinstated the license retroactively.[9] However, on June 1, 1989, ASCAP informed Pineau that the stations owed over $3,000.00 in additional licensing fees, including monthly charges and adjustments to 1988 fees.[10]

The stations' ASCAP account remained in arrears thereafter. On August 7, 1989, a second notice of default was dispatched, declaring that, without payment in full, the stations' license would be terminated in thirty days. Through Pineau, Sunspot promised to pay past due fees in installments. Pineau explained that he expected the stations' ratings to improve, with resulting increases in advertising revenues. ASCAP agreed to forbear. In October 1989, David Bander, ASCAP's senior account executive, informed Pineau that the stations had failed to cure their default within thirty days of the August 7 notice and complained that payments for the intervening months had not been made. Bander stated:

In addition, our Stations Relations Representative, John Willett has reported on his September 20, 1989 conversation with you. In that conversation, you agreed to submit at least one monthly charge for September—November, 1987 [sic] and a "major" payment in December. To date, no payment has been received.

If ASCAP is to continue to extend credit to you in the terms discussed with Mr. Willett, payment of $798 representing the September and October installments must be submitted immediately. If payment in this amount is not received, or if full payment is not made, we will send certified notice of termination

---

4. The plaintiffs have prosecuted this action through ASCAP. Although Pineau challenged ASCAP's agency at trial, the evidence discloses that each of the plaintiffs is an ASCAP member and that Pineau has long acknowledged ASCAP to be their agent for purposes of licensing broadcasts of their copyrighted songs.

5. Sunspot was the subject of its own bankruptcy case, Case No. 91–10050, filed under Chapter 11 on January 17, 1991, and later converted to Chapter 7.

6. At the outset, the stations were designated by the call letters WGUY–AM and WGUY–FM. Plaintiffs' Exhibits 1A and IX.

7. ASCAP's blanket licensing fees are computed as a percentage of historical monthly gross revenues. Licensees must submit annual reports to ASCAP detailing their revenues. After year end, accounts may be audited, with fees adjusted for actual revenues. In a station's first year of operation, fees are set based on revenue projections.

A blanket license must be distinguished from a more limited "per program" license, for which a fee which takes into account programming that actually uses copyrighted musical compositions is charged. Trial Stipulation No. 8; Testimony of D. Hochman.

8. On November 22, 1988, ASCAP sent the stations notice that their license would be canceled unless defaults were cured within thirty days. The license was not actually terminated until the following March. Plaintiffs' Exhibit 1B.

9. Plaintiffs' Exhibit 1C (stations' remittal letter of March 20, 1989). ASCAP's March 24, 1989, letter informed Pineau, as the stations' president, that reinstatement "render[ed] moot any claims for copyright infringement that may have arisen during the unlicensed period." Plaintiffs' Exhibit 1E.

10. ASCAP's claim for additional fees, which was not disputed, was based on audited station revenues and resulting fee adjustments. Plaintiffs' Exhibit 1F.

as pursuant to our notice, of August 7, 1989.[11]

John Willett discussed the situation with Pineau on November 7 and December 26, 1989. Willett's contemporaneous memoranda detail ongoing discussions with Pineau and Pineau's attempts to raise funds to sustain the stations and to pay ASCAP.[12] On January 5, 1990, Pineau told Willett that he would be unable to make a "sizeable" reduction in the balance owed ASCAP in the near future and that the stations could not possibly remit more than one monthly payment.

On January 26, 1990, Bander wrote to Pineau, again citing the August 7, 1989, notice of default and informing him that the stations' license was terminated. ASCAP sent a formal termination notice under separate cover the same day.[13]

On April 23, 1990, Bander wrote to Pineau acknowledging that ASCAP had received the stations' recently filed annual report for 1989 and informing Pineau that the balance due to ASCAP was $8,612.20, subject to audit. In closing, Bander stated that ASCAP accepted the report for "informational purposes only" and reminded Pineau, "Until such time that full payment is received, WKIT–AM/FM will remain unlicensed, and any performances of our members [sic] copyrighted musical compositions without advance written permission, have constituted, and will continue to constitute infringements under the United States Copyright Law." [14]

Finally, on September 17, 1990, Bander informed the stations of the copyright violations that are the subject of this action, but offered to "resolve claims for infringement arising from these and other unauthorized performances on the basis of retroactive licensing upon payment of license fees and reimbursement of our monitoring expenses." [15]

When the stations remained in default, ASCAP initiated a civil copyright infringement suit against Pineau in United States District Court. Upon Pineau's personal bankruptcy filing, plaintiffs initiated this adversary action.

*Discussion*

1. Jurisdiction.

 The parties have consented to entry of final judgment by the bankruptcy court. 28 U.S.C. § 157(c)(2). Consents notwithstanding, the court determines that the complaint seeking to establish an exception to discharge is a core proceeding. 28 U.S.C. § 157(b)(2)(I). Jurisdiction lies under 28 U.S.C. § 1334 and the United States District Court for the District of Maine Order Referring Bankruptcy Proceedings dated August 4, 1984. The other components of plaintiffs' claims are properly joined under F.R.Bankr.P. 7016. Determination of the dischargeability issues in Pineau's favor renders it unnecessary to consider questions of jurisdiction relating to liquidating plaintiffs' claims or ordering injunctive relief.[16]

2. Dischargeability Issues Under § 523(a)(6).

 In the following terms, 11 U.S.C. § 523 excepts from discharge debts arising

---

**11.** Plaintiffs' Exhibit 1M.

**12.** Willett's reports demonstrate that Pineau acknowledged the license obligation and that the prospects for payment were tied to, among other things, the stations' advertising revenues and, possibly, obtaining additional contributions to Sunspot's equity. Plaintiffs' Exhibit 1L and 1N.

**13.** Plaintiffs' Exhibits 1Q (letter of January 26, 1990) and 1S (termination notice).

**14.** Plaintiffs' Exhibit 1U.

**15.** Plaintiffs' Exhibit 1V. "Monitoring expense" relates to ASCAP's costs in tape recording in-

fringing broadcasts. ASCAP's right to demand payment of the expense, which amounts to less than $300.00, is not disputed.

**16.** Jurisdiction to liquidate claims that are the subject of dischargeability actions can be found under 28 U.S.C. § 157(b)(2)(I) and, perhaps, (O). *But see* L. King, *Collier on Bankruptcy,* para. 3.01 at 3–50 (15th Ed.1991) (subsection (O) speaks "primarily to the reorganization chapters"). Jurisdiction to issue an injunction such as plaintiffs seek may lie under § 157(b)(2)(O), as well, or may be a non-core, related matter. *See In re G.S.F. Corp.,* 938 F.2d 1467, 1475 (1st Cir.1991); *In re Arnold Print Works, Inc.,* 815 F.2d 165, 166–67 (1st Cir.1987).

from a debtor's willful and malicious conduct:

> § 523. *Exceptions to discharge.*
>
> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . . .
>
> (6) For willful and malicious injury by the debtor to another entity or to the property of another entity....

To establish the § 523(a)(6) discharge exception, the creditor must prove by a preponderance of the evidence,[17] that the debtor's "willful and malicious" actions caused injury to it or to its property, giving rise to the debt at issue. *In re Long,* 774 F.2d 875, 881 (8th Cir.1985) (willfulness and malice are separate elements and should not be "lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable"). Only if both elements are proved is the discharge exception established. *See generally* 3 L. King, *Collier*

*on Bankruptcy* ¶ 523.16 (15th ed. 1992) at 523–130.

a. *Willfulness.*

▇▇▇ Although § 523(a)(6)'s elements are not applied with universal conformity,[18] addressing the "willfulness" element is straightforward. With enactment of the Bankruptcy Code of 1978, earlier authorities that applied a "reckless disregard" standard to the exception's "willfulness" element were overruled.[19] Simply stated, "willful" means "deliberate or intentional." *In re Britton,* 950 F.2d 602, 605 (9th Cir. 1991); *In re Ikner,* 883 F.2d 986, 990 (11th Cir.1989); *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989); *Cassidy v. Minihan,* 794 F.2d 340, 342 (8th Cir.1986); *St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003, 1009–10 (4th Cir.1985); *Seven Elves, Inc. v. Eskenazi,* 704 F.2d 241, 245 (5th Cir.1983). *See also In re Nance,* 556 F.2d 602, 611 (1st Cir.1977) (Bankruptcy Act case).[20]

---

**17.** The court concludes that the burden of proof for § 523(a)(6) actions is a preponderance of the evidence. *See Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Although the issue before the *Grogan* court was strictly the burden of proof in § 523(a)(2)(A) actions, its dictum to the effect that the preponderance of the evidence standard applies "across the board" under § 523(a) is compelling. *Id.* 111 S.Ct. at 659–60. *But see In re Tague,* 137 B.R. 495, 504 (Bankr.D.Colo.1991) (post-*Grogan* case applying clear and convincing burden of proof). Of course, standards for proving "willfulness" and "malice" in state law causes of action may vary. *Id. See also, e.g., Pombriant v. Blue Cross/Blue Shield,* 562 A.2d 656, 659 (Me.1989) (malice for punitive damages award requires showing by clear and convincing evidence).

**18.** *See, e.g., Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1262–63 (11th Cir.1988) (discussing formulations of the § 523(a)(6) discharge exception under the Bankruptcy Code in light of legislative history and pre-Code law). *See also In re Tague,* 137 B.R. at 504 (discussing burden of proof issues).

**19.** The immediate antecedent to the Code's § 523(a)(6) was § 17(a)(8) of the Bankruptcy Act, *infra* n. 22. Some authorities interpreted the Supreme Court's decision in *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), construing an earlier formulation of the exception, as expanding the willfulness element

to embrace reckless or grossly negligent conduct, notwithstanding *Tinker's* clear dictate that "willful" means "intentional and voluntary." *Id.* at 485, 24 S.Ct. at 508. *See e.g., Den Haerynck v. Thompson,* 228 F.2d 72 (10th Cir.1955). *See generally* Tabb, *The Scope of the Fresh Start in Bankruptcy: Collateral Conversions and the Dischargeability Debate,* 59 Geo.Wash.L.Rev. 56, 67 (1990) (hereafter "Tabb"); Countryman, *The New Dischargeability Law,* 45 Am.Bankr.L.J. 1, 16 (1971) (hereafter "Countryman"). *See also In re Cloutier,* 33 B.R. 18, 19 (Bankr.D.Me.1983) (purporting to apply willfulness standard in finding drunk driving-related obligation nondischargeable). The legislative history to § 523(a)(6) makes it clear that, to the extent any question existed, the Bankruptcy Code overruled those cases. H.R.Rep. No. 595, 95th Cong. 1st Sess. 365 (1977). *See In re Compos,* 768 F.2d 1155, 1158 (10th Cir.1985). The Code's impact on the exception's "malice" element, however, has been the subject of some debate. *See Chrysler Credit Corp. v. Rebhan,* 842 F.2d at 1262–63 and discussion *infra.*

**20.** A few cases continue to describe willfulness in terms that imbue it with subjective content. *See In re Miera,* 926 F.2d 741, 744 (8th Cir.1991) (describing "willful" as "headstrong and knowing"). Such language obfuscates the distinction between the discharge exception's two elements, adding to "willful" some notion of wrongfulness, a factor appropriately considered under the malice prong of the inquiry. In this regard,

Pineau acted willfully when, on his authority, Sunspot's stations broadcast copyrighted songs on March 17, 1990. Although Pineau attempted to portray himself as uninvolved in the stations' operations, contending that he should not be liable for the copyright infringements when persons other than he composed the stations' playlists and, in each case, put needle to groove (or laser to disc), he conceded that he had final authority to determine which songs were played, or if any were played at all.

Under such circumstances, the requisites to infringement liability are present. *See, e.g., Jobete Music Co. v. Media Broadcasting Corp.*, 713 F.Supp. 174, 178 (M.D.N.C. 1988) (infringement liability extends to corporate principal who has the right and ability to supervise infringing activity, and, also, has a financial interest in the activity). Moreover, Pineau's personal liability is direct. *See Jobete Music Co. v. Media Broadcasting Corp.*, 713 F.Supp. at 178; *Nick–O–Val Music Co. v. P.O.S. Radio, Inc.*, 656 F.Supp. 826, 828 (M.D.Fla.1987). In directing continued station operations with music programming and, hence, in directing that copyrighted material be played without license, Pineau acted deliberately and intentionally, satisfying § 523(a)(6)'s "willfulness" requirement.[21]

### b. *Malicious.*

The second element of the § 523(a)(6) discharge exception requires that "maliciousness" be shown in the conduct giving rise to the claim. Although the Bankruptcy Act contained substantially similar provisions,[22] abundant case law under the Code has embraced varying formulations of the substantive content of § 523(a)(6) malice and of the methods by which it may be proved.[23] Perhaps no area of § 523(a)(6) inquiry is more confused than that of applying the exception's malice component with regard to claimed injuries to "property" interests that are the subjects commercial and contractual relationships, often in the context of collateral conversions. A brief review of pertinent authorities will assist in alleviating that confusion and in resolving the pending dispute.

In *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the Supreme Court considered the Act's "willful and malicious injury" exception to discharge. *Tinker* held that a tort obligation for damages for criminal conversation with another's wife was within the exception.[24] Speaking to the exception's malice requirement, the Court commented that "Malice … in its legal sense means a wrongful act, done intentionally, without just cause or

---

the meaning of willfulness under § 523(a)(6) differs from definitions employed in other contexts. *Cf. Andover Newton Theological School, Inc. v. Continental Casualty Co.*, 930 F.2d 89, 92 n. 3 (1st Cir.1991) (discussing Massachusetts law definition of willfulness in insurance coverage dispute).

**21.** This is not a case in which Pineau's involvement in the infringing activities was passive and liability, therefore, would attach derivatively. *See Coleman v. Payne*, 698 F.Supp. 704, 706 (W.D.Mich.1988). *See also Jobete Music Co. v. Media Broadcasting Corp.*, 713 F.Supp. at 178. In addition, ASCAP introduced documents establishing that, through involvement in past infringement litigation, Pineau knew that the stations were required to hold valid licenses to play copyrighted music over the air. Thus, he not only deliberately continued music programming, he did so knowing that he was proceeding without the required license. *See Coleman v. Payne*, 698 F.Supp. at 706 (past infringement actions provide notice of licensing requirements).

**22.** Bankruptcy Act § 17(a)(8), 11 U.S.C. 35(a)(8), repealed by Act Nov. 6, 1978, P.L. 95–598, Title I, § 101, 92 Stat. 2549, provided:

A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as

. . . . .

(8) are liabilities for willful and malicious injuries to the person or property of another other than conversion as excepted under clause (2) of this subdivision.

Although it underwent several mechanical modifications, the discharge exception for willful and malicious injuries has long been a part of the bankruptcy statutes. *See* Countryman, *supra* note 19, at 24–5.

**23.** *See* Tabb, *supra* n. 19, at 73–89.

**24.** 193 U.S. at 485, 24 S.Ct. at 508.

excuse." [25] Importantly, *Tinker* recognized that, although maliciousness is a separate element of the exception, it need not always be proved by independent evidence of intent. Some deliberate acts are so inherently wrongful that the law presumes that one who performs them has acted with malice:

> [W]e are of the opinion that, within the meaning of the exception, it is not necessary that there should be this particular, and, so to speak, personal malevolence. . . ., but that *the act itself necessarily implies that degree of malice which is sufficient* to bring the case within the exception stated in the statute. The act is willful, of course, in the sense that it is intentional and voluntary, and we think it is also malicious within the meaning of the statute.

> In order to come within that meaning as a judgment for willful and malicious injury to person or property, it is not necessary that the cause of action be based upon special malice, so that without it the action could not be maintained.

193 U.S. at 485, 24 S.Ct. at 508. (Emphasis supplied.)

The notion that malice may be inferred from the character of action, sometimes referred to as "constructive malice" [26] or "implied malice", [27] has long been accepted in the law generally, [28] and in bankruptcy discharge litigation specifically. [29] *Tinker* held that, for purposes of the discharge exception, implied malice would suffice. The First Circuit has followed *Tinker*. *In re Nance*, 556 F.2d at 611.

After establishing that property conversions could create debts within the Act's "willful and malicious" injury exception in *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916), the Supreme

Court shed additional light on the exception's scope. In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), a secured lender argued that the debtor's sale of its collateral, a car, without the consent required by loan documents, constituted a willful and malicious injury to its property and, therefore, created a non-dischargeable obligation. The parties' past course of dealing, in which the debtor sometimes had sold cars without the lender's consent, led the Court to hold that malice had not been shown. The *Davis* opinion is instructive for its declaration that a court must look at all pertinent circumstances in determining whether the requisite malice inheres in conduct giving rise to liability:

> But a willful and malicious injury does not follow as of course from every act of conversion, without reference to circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. . . . There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

293 U.S. at 332, 55 S.Ct. at 153. (Citations deleted.)

There is no indication in the language of § 523(a)(6) or in pertinent legislative history that, when it enacted the Bankruptcy Code, Congress changed the long-settled rule that the "malicious" prong of the exception could be established by a showing of implied malice, *i.e.*, "a wrongful act done intentionally without just cause or excuse," [30] an act "wrongful in and of itself." [31] *See Chrysler Credit Corp. v. Re-*

---

**25.** 193 U.S. at 485–86, 24 S.Ct. at 508, quoting from *Bromage v. Prosser*, 4 Barn. & Cres. 247.

**26.** Black's Law Dictionary, Rev. 4th Ed. (West 1968).

**27.** *Id.*

**28.** *See, e.g. Sparf and Hansen v. United States*, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895) ("Implied malice is an inference of the law from

any deliberate and cruel act committed by one person against another.").

**29.** *Tinker v. Colwell*, 193 U.S. at 485, 24 S.Ct. at 508.

**30.** *Id.* at 486, 24 S.Ct. at 508.

**31.** *Id.*

bhan, 842 F.2d at 1263 (citing *United Bank of Southgate v. Nelson*, 35 B.R. 766, 774 (N.D.Ill.1983)).[32]

Nevertheless, courts continue to wrestle with defining and applying § 523(a)(6)'s "malice" element.[33] Some have adhered to the view that proof of "special malice," a subjective intention to harm the injured party, is required. *See e.g., In re Weber*, 99 B.R. 1001, 1014–15 (Bankr.D.Utah 1989) ("specific intent" to injure creditor required); *In re Hodges*, 4 B.R. 513, 516 (Bankr.W.D.Va.1980) (requiring "intent to harm"). *See also In re Langer*, 12 B.R. 957 (D.N.D.1981). Others, analyzing various facts surrounding the debtor's conduct, settle on the debtor's state of mind as the critical factor. *See In re Burdick*, 65 B.R. 105, 111 (N.D.Ind.1986) (debtor's "good faith" vitiates claim of maliciousness).

A number of courts hold that, although malice may be inferred from actions that render harm "certain or almost certain" to result, § 523(a)(6) requires that the debtor's conduct be "targeted" at the injured party. *See, e.g., In re Miera*, 926 F.2d at 744. Under such a test, the debtor may disclaim an intention to harm the creditor by explaining, for example, that his or her conduct was aimed to keep a troubled business afloat, rather than to deprive a specific creditor of property or collateral. *See In re Phillips*, 882 F.2d 302, 305 (8th Cir.

1989); *In re Long*, 774 F.2d at 882. *See also In re Brouillet*, 125 B.R. 341, 344 (Bankr.D.Mass.1991), *rev'd*, 138 B.R. 338, (D.Mass.1992); *In re McLaughlin*, 109 B.R. 14, 17 (Bankr.D.N.H.1989); *In re Littleton*, 106 B.R. 632 (Bankr.9th Cir.1989).

■ Analyses that inquire into the debtor's mindset when implied malice has been shown necessarily employ a subjective standard. *See, e.g., In re McLaughlin*, 109 B.R. at 17 (following *In re Long* and expressly acknowledging use of a subjective standard). In so doing, they treat implied malice as a method by which a debtor's state of mind is sought to be proved by circumstantial evidence, subject to rebuttal by the debtor's testimony (or other evidence) that a subjective intent to do harm did not exist. *See, e.g., In re Long, supra; In re Burdick*, 65 B.R. at 109–10. Such decisions fail to appreciate that, under the implied malice standard, the debtor's state of mind is not germane.[34] *In re Nance*, 556 F.2d at 611.

■ Of course, implied malice should come into play only when the evidence demonstrates that the debtor's actions constituted:

'a willful disregard of what [he knew] to be his duty, an act which [was] against good morals and wrongful in and of itself, and which necessarily cause[d] inju-

---

**32.** *See Dewsnup v. Timm*, ─ U.S. ─, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (major changes from pre-Code law are not to be presumed, no matter how vague the language, in the absence of some discussion in the legislative history). Some cases have considered the legislative history and have concluded that the Code overruled *Tinker's* implied malice standard. *See, e.g., In re Gallaudet*, 46 B.R. 918, 926 (Bankr.D.Vt.1985). This court agrees with the analysis of *United Bank of Southgate v. Nelson, supra*, that such was not the case.

**33.** *See generally* Comment, *The Exception to Discharge for Willful and Malicious Injury: The Proper Standard for Malice*, 7 Bankr.Dev.J. 245 (1990). *See also Tabb, supra* n. 19. Many of the cases cited in this memorandum were decided before *Grogan v. Garner, supra*, and apply the "clear and convincing" burden of proof. *See supra* n. 17. For purposes of this discussion, focusing on the *elements* of the § 523(a)(6) exception, the standard of proof employed is not important.

**34.** The § 523(a)(6) exception may, of course, also be proved by showing special malice. When a subjective intention to harm is proved, the debt resulting from willful action will be nondischargeable. *See In re Posta*, 866 F.2d at 367; *In re Grieg*, 21 B.R. 583, 584 (Bankr.Me. 1982). *Cf. In re Picard*, 133 B.R. 1 (Bankr.D.Me. 1991) (state court found no special malice). In such cases, a debtor may deny that he or she acted with an ill motive. In implied malice cases, where the debtor's actions warrant an imputation of malice, the presence or absence of a subjective intent to harm, or to target, the creditor is not a required element of the discharge exception. *Tinker v. Colwell, supra; In re Nance, supra*. Denials of such intent are, therefore, not relevant. *Cf. In Re Cloutier*, 33 B.R. 18, 19 (Bankr.D.Me.1983) (in light of character of act, drunk driving, debtor "will not be heard to say that he did not intend to cause the harm") (quoting *In re Donnelly*, 6 B.R. 19, 22 (Bankr.D.Or.1980)).

ry and [was] done intentionally.' *Tinker v. Colwell*, 193 U.S. 473, 487, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1904). There need be no showing of "special malice" toward the injured party, only that the act "is done deliberately and intentionally in knowing disregard of the rights of another."

*Id.* (quoting *Bennett v. W.T. Grant Co.*, 481 F.2d 664, 665 (4th Cir.1973)). Under such circumstances, the law imputes the requisite malice to the actor by virtue of the character of the act.

■ Whether the act is one that demonstrates implied malice must be determined by examining the conditions that obtained when the act was committed. The court should determine whether the facts, including the debtor's experience in similar situations or transactions, his attempts at concealing significant information from the creditor, his knowledge or understanding of his relative rights and obligations vis a vis the creditor, and his course of dealing with the creditor, demonstrate that the debtor acted deliberately and intentionally, in knowing disregard of the creditor's rights, without justification or excuse.[35] This approach comports with the law of the First Circuit, *In re Nance*, 556 F.2d at 611, as well as with the better-reasoned decisions of other circuits. *See e.g., In re Cecchini*, 780 F.2d 1440, 1443 (9th Cir. 1986); *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009 (4th Cir.1985); *Chrysler Credit Corp. v. Rebhan*, 842 F.2d at 1262–3. *Cf. In re Posta*, 866 F.2d at 368 (affirming discharge of debt because debtors were inexperienced, did not read security agreement and did not understand business concepts).

■ Proceeding under the implied malice model does not, as some would argue, collapse § 523(a)(6)'s two elements into one. The court must first discern a willful act. Then it must proceed to assess the pertinent factors to determine whether the act's character establishes implied malice. *Davis v. Aetna Acceptance Co.*, 293 U.S. at 332, 55 S.Ct. at 153; *In re Posta*, 866 F.2d at 368.

■ In assessing the character of the debtor's conduct, a course of dealing that provides the debtor with a legitimate expectation or belief that his conduct will be forgiven or excused, or that he acted with the creditor's consent, must be considered. If such a course of dealing existed, the debtor's actions will not support a finding of implied malice.[36]

■ In this case, Pineau clearly knew and appreciated Sunspot's stations' need for a valid license in order to broadcast performances of copyrighted works in the ASCAP library. When the stations infringed plaintiffs' copyrights, it was done with Pineau's knowledge and at his direction. Other bankruptcy courts have found it unnecessary to go much further to find copyright infringement liability excepted from discharge under § 523(a)(6). *See In re Elms*, 112 B.R. 148 (Bankr.E.D.La.1990); *In re Gabaldon*, 55 B.R. 431 (Bankr. D.N.M.1985); *In re Lynch*, 16 U.S.P.Q.2d (BNA) 1971, 1990 WL 126199 (1990). Yet, a number of facts distinguish this case from those cases, as well as from cases in which conversion of a secured creditor's collateral has been found to create nondischargeable obligations under § 523(a)(6).

Pineau and Sunspot were engaged in an extended commercial relationship with AS-CAP. Unlike the debtor in *Gabaldon*, Pineau did not simply ignore the copyright laws and demands that he comply with them. Rather, he worked with ASCAP in an ongoing attempt to maintain, and later to restore, the stations' license for a period extending well beyond the March 17, 1990, infringements. Unlike the debtor in *re*

---

**35.** The factors set forth above are drawn largely from the opinion of the district court in *United Bank of Southgate v. Nelson*, 35 B.R. at 776, with modifications to address applications of 523(a)(6) in contexts beyond collateral conversions and to take into account the teachings of *Davis v. Aetna Acceptance Co., supra;* and *In re Posta, supra.*

**36.** *See Davis v. Aetna Acceptance Co., supra. Davis* provides guidance that the debtor/creditor course of conduct, as opposed to the debtor's unfounded assumptions, rosy expectations, or unilateral, subjective beliefs, is the appropriate focus of inquiry.

*Elms,* Pineau did not fail and refuse to even register with authorities that regulated the infringing activity. ASCAP, as plaintiffs' agent, treated the WKIT account as, essentially, a commercial receivable and even described its relation to the stations as "extending credit." Both before and after the infringements, ASCAP implicitly encouraged Pineau to continue operations by seeking payment from operating revenues or from new equity contributions, sources dependent on the stations' continuing operations. Moreover, Pineau concealed nothing. He even submitted the stations' annual revenue report to ASCAP after the license termination.

At the time of the infringing activity, although the stations' license had been terminated formally, Pineau had, based on his course of dealing with ASCAP, good grounds to believe that ASCAP's informal consent to operate, and thereby to generate revenues to "pay up," had been given. As late as August 1990 ASCAP encouraged payment with the promise of retroactive license reinstatement—something it had granted to these very stations in the past.

Thus, although Pineau knew he was acting wrongfully in the face of plaintiffs' rights on March 17, 1990, when the infringements occurred, he did so with "justification or excuse," grounded in a course of dealing with ASCAP, not merely upon his own, subjective notion of what he could get away with or what might work.

Under such circumstances, the court does not accept the proposition apparently embraced by the *Elms* and *Gabaldon* courts that violation of copyright law is, in and of itself, an aggravating circumstance supporting a finding of implied malice. Rather, this court concludes that, under the facts as they existed at the time of the acts giving rise to plaintiffs' claims, the nature of Pineau's conduct was not of the character that supports a finding of implied malice.[37]

Thus, Pineau's obligation arising from infringement of plaintiffs' copyrights will be discharged.

3. Other Relief.

Given the court's disposition of the § 523(a)(6) complaint, there is no need to liquidate plaintiffs' claims for damages. Moreover, because the injunction plaintiffs seek would require Pineau to do no more than obey the copyright laws in the future, and because no other relief is to issue, the court will not consider issuing the injunction sought on a stand alone basis.

---

**37.** Plaintiffs have neither alleged nor introduced evidence of specific malice on Pineau's part.